UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE


NANCY H. ROBERTS                    )
                                    )
v.                                  )        NO. 2:02-CV-166
                                    )
ANTHONY J. PRINCIPI,                )
SECRETARY OF VETERANS  AFFAIRS      )


## MEMORANDUM  OPINION

This civil action was originally brought by plaintiff, an employee of the

United States Department of Veterans Affairs ("VA"), alleging discrimination in

violation of the Age Discrimination in  Employment Act ("ADEA"), 26 U.S.C. §§ 621 *et*

*seq*., adverse employment action in retaliation for having engaged in protected EEO Title

VII activity in violation of 42 U.S.C.  § 2000e *et seq.,*  and violation of the Freedom of

Information Act ("FOIA").   Plaintiff has abandoned her ADEA claim and defendant  has

conceded an inadvertent violation of FOIA.[1]   Plaintiff's retaliation claim proceeded to

trial before the Court without intervention of a jury on January 18-19, 2006.

---

[1]   Because the VA later provided to Roberts all the documents requested by her pursuant to the FOIA, the merits
of her FOIA claim for relief are MOOT.  Her eligibility and entitlement to recover attorneys fees, however, must still be
resolved.

## Findings of Fact

The plaintiff in this civil action is Nancy Roberts ("Roberts"), a 57[2] year old Caucasian female Certified Registered Nurse Anesthetist (CRNA) who is employed full-time by the James H. Quillen Veterans Affairs Medical Center (VAMC) in Johnson City, Tennessee. Roberts has worked at VAMC since 1996, having been selected for a position in the surgical service at VAMC through a competitive process. She received an appointment to a position as a CRNA pursuant to 38 U.S.C. § 7401 *et seq*. Under this type of appointment, the VA hires health care professionals and provides them pay enhancements and incentives because of their specialized medical skills.

From the time of her appointment in 1996 through June 30, 2001, Roberts was assigned to serve as a CRNA in the surgical service, which included the anesthesia section, and which was led by Dr. Clarence Goulding. The anesthesia section included six CRNAs and one licensed practical nurse. Dr. Goulding was the direct line supervisor of the plaintiff and the other five CRNAs. The CRNAs, at the time in question during 2001, were, in order of seniority: Wanda Ibrahim, Carolyn Harris, Nancy Roberts, Rachel Weston, Ruben Fuentes and Cathy Jo Hunt. Wanda Ibrahim had been designated lead CRNA by Dr. Goulding for many years and performed most of the administrative functions attendant to that position.

---

[2] Plaintiff was 53 year old at the time of the filing of her complaint. Her age is irrelevant to her remaining claim.

During the relevant time period, the surgical service at VMAC operated five operating rooms five days a week, usually 52 weeks per year. This required the coordination of several different services and components of the hospital. Both the anesthesia section and the surgery service were managed by the Medical Chief of Staff, Dr. Louis Cancellaro ("Cancellaro"). The registered nurses and licensed practical nurses who worked in the operating room were part of the nursing service, which was headed by Juan Morales, R.N. Morales and the nursing service answered directly to Dr. Carl Gerber ("Gerber"), Director of the VAMC. Each operating room at the VMAC was staffed by a single CRNA assigned by the anesthesia section and at least two registered nurses assigned by the nursing service. CRNAs administer anesthesia under the oversight of an anesthesiologist. Typically, the VAMC performed approximately 50 scheduled surgeries per week. In addition, the VAMC also performed emergency surgery which required that nurses and anesthetists remain on call to perform emergency work. At the time in question (1996 through June 30, 2001), the VAMC had five operating room suites. Typically, four were used at any one time, leaving one operating room free for surgical-type diagnostic procedures and for emergencies. Most surgeries were scheduled to be performed between the hours of 7 a.m. and 3 p.m. As a result of the schedule, five CRNAs typically worked the 7 to 3 shift, and the sixth CRNA worked after the 3 p.m. shift ended. The CRNAs shared both the shift schedule and emergency call duties on a rotating basis.

During January, 2001, Roberts had certain profane, vulgar and gender oriented comments directed at her and other female CRNAs by male co-worker Ruben Fuentes, a CRNA who had been hired in 1999. Roberts complained about Fuentes' behavior to the chief of the anesthesia section, Dr. Goulding. On January 29, 2001, Roberts contacted a VA Equal Employment Opportunity (EEO) counselor and complained about Fuentes' actions and Dr. Goulding's lack of response to her complaints. Apparently at the suggestion of the EEO counselor, Roberts utilized the existing command structure at the VA and took her complaints to Dr. Theron T. Knight, Jr., the VAMC Chief of Surgery. Dr. Knight assured Roberts that he would talk with Fuentes and Lori Hagen ("Hagen"), Nurse Supervisor, who Roberts also alleged had made hostile and retaliatory remarks toward her. According to Roberts, Fuentes and Hagen thereafter altered their abusive behavior toward her.

Roberts alleges that after the time limit for her to file a "formal" claim of discrimination and retaliation had expired, Hagen followed her down a hallway and accosted her, something Hagen denies. About the same time, Roberts was shown a note by a co-worker which the co-worker claimed Ruben Fuentes had given her for delivery to Roberts. The note contained vulgar and derogatory comments which Roberts believed were directed at her. In April, 2001, Roberts filed a formal complaint of discrimination with the VA alleging that nurse supervisor Hagen discriminated against her on April 19, 2001. The investigator assigned to the complaint telephoned and interviewed nursing

supervisor Hagen concerning Roberts' allegations. Shortly after her conversation with the investigator, Hagen walked out of her nurse manager's office and told her nursing staff in the operating room that Roberts had just filed EEO charges against her and that she was resigning her position in the OR because of Roberts. Hagen admitted at trial that she had already been interviewed and selected for the Patient Safety Officer position at the VA and already planned to transfer to that position from her position as nursing supervisor, because she was "burned out" in the operating room. Hagen did not disclose this information to her staff but rather blamed her resignation on Roberts' EEO complaint. After learning of the EEO complaint and Hagen's plans to transfer to another position, various operating room staff began to circulate several petitions against Roberts which criticized her for filing a "complaint against Ms. Hagen" and of behavior which created a hostile work environment.[3] A petition circulated by the nurses accused the plaintiff of "inappropriate and intimidating behavior" toward a co-worker and of generally creating discord in the operating room. These petitions were forwarded to VAMC Director Gerber. Gerber gave the petitions to Cancellaro for his review and action. At the time Gerber forwarded the petitions to Cancellaro, Gerber was aware of Roberts' EEO charges.

---

[3] One petition was drafted by CRNA Rachel Weston and was signed by four CRNAs. A second petition was drafted by nurse Stephanie Story and was signed by nursing staff employees. A third petition was drafted by Dr. Julia Dunn and was signed by her and eleven other VAMC surgeons.

Cancellaro immediately realized that the VAMC had a potentially serious problem which threatened patient care. Cancellaro was particularly concerned about the petition signed by Dr. Julie Dunn and eleven (11) other VAMC surgeons. Fearing that the disruption in the operating room directly affected patient care, Cancellaro summoned Roberts, who he did not know, to his office on June 27, 2001 and informed her that he had received complaints against her and that he was removing her temporarily from the anesthesia section and detailing her to the VAMC's emergency room as a staff nurse.[4] A temporary detail is not punitive and the employee retains the same salary and benefits as before. A temporary detail can be made for six months and extended for another six months. A final decision must be made within one year of the temporary detail. Cancellaro felt he could not wait for a formal investigation because of the potential impact on patient care threatened by the discord in the operating room. Roberts attempted to discuss her EEO charges with Cancellaro at the time of the June 27, 2001 meeting; however, Cancellaro responded that he did not want to hear anything about the EEO charges.

---

[4] As a general rule, a temporary transfer which results in no reduction in pay or benefits is not an "adverse employment action." *See Yates v. AVCO Corporation*, 819 F. 2d 630 (6th Cir. 1987). An adverse employment action is "an employment decision that is materially adverse in that it is more than a mere inconvenience or an alteration of job responsibilities." This typically includes "termination, demotion, diminished pay, a less distinguished title, a material loss of benefits, significantly diminished responsibilities, or other unique indices." *Jones v. City of Allen Park*, 2006 WL 13109 (6th Cir. (Mich.)). Roberts claims that her later permanent reassignment to the GI lab deprived her of the opportunity to receive certain overtime pay and resulted in job responsibilities not commensurate with her training as a CRNA. Although Roberts rarely worked overtime in the operating room and actively attempted to avoid it, the lost opportunity to sign up for overtime is sufficient to establish an adverse employment action. *Id.* at * 6.

On June 20, 2001 a fact finding board commissioned by the VA was charged with looking at the issues involved in the three petitions. The fact finding board began interviewing witnesses in an informal setting on June 28, 2001. Roberts was interviewed on that date but advised the board that she was unaware of the accusations against her, was unprepared to defend herself and that she believed the fact finding proceedings were in retaliation for having filed EEO charges. The board then adjourned until July 6, 2001. The fact finding board issued its final report on July 18, 2001 and recommended that Cancellaro permanently remove Roberts from the surgery service because of patient safety concerns and health care quality concerns. [5]

Seeking a more formal review of the issues involving Roberts, Cancellaro asked the VAMC Director to authorize an Administrative Board of Inquiry (ABI) comprised of employees from other VA facilities to hear sworn testimony concerning the issues raised by the petitions.[6] The ABI, appointed by VMAC Director Gerber, heard sworn testimony at the VAMC in March, 2002, including testimony from the plaintiff and witnesses proposed by the plaintiff. At the conclusion of its investigation, the ABI issued a formal written report on May 16, 2002. Among its findings, the ABI stated that " . . . the reappointment of Ms. Roberts to the anesthesia service would be detrimental to the James H. Quillen VA Medical Center Surgery Program as many surgeons would

---

[5] The specific findings of the Fact Finding Board are set forth in Trial Exhibit 14.

[6] An Administrative Board of Inquiry is never used by the VA to investigate an EEO complaint.

7

reportedly resign and patient care could be compromised through the many distractions this would cause." After receipt of the ABI report, Cancellaro permanently reassigned Roberts to the GI lab at the VAMC. According to Cancellaro, the ABI findings were "very clear and adequate to warrant permanent reassignment." Roberts reassignment was made without any loss of pay or benefits except that she lost the opportunity for certain overtime pay and was working in a position which did not permit her to utilize her CRNA skills. Roberts remained in the GI lab until it was consolidated with surgery services in July, 2005. Roberts is now assigned to VAMC's Bronchoscopy Lab.

Although Roberts professional performance as a CRNA was generally adequate, except for her performance in the operating room during surgeries performed by Dr. Janet Brown as detailed more fully below, her interpersonal relationships with others were less than satisfactory. For quite some time, Roberts had been a source of discord and discontent within the operating room. Hagen testified that Roberts had harassed her for about two years prior to the filing of the EEO complaint, constantly made complaints to her supervisors and sought favoritism through the inappropriate giving of gifts. Even Roberts described her relationship with Hagen as "cautious". Roberts displayed problems with anger management, something the Fact Finding Board cited in support of its recommendation.[7] Rachel Weston, another CRNA assigned to the operating room, testified that Roberts "could not get along with anyone" and would not

---

[7] Roberts denied any loss of temper and any "serious" anger management issues.

cooperate with the group. Weston reported that Roberts began causing trouble shortly after her assignment to the operating room and wanted various procedures changed. Weston described Roberts' manner as "a bulldozer" and that she constantly made complaints to Dr. Goulding. Weston described disruptive behavior on the part of Roberts, including outbursts of anger, chronic temper tantrums and interruption of others during pre-operative interviews. Roberts was, according to Weston, "demanding", "disruptive" and "irrational".

Dr. Julie Dunn, a general and trauma surgeon at VAMC and professor of surgery at the East Tennessee State University College of Medicine, was responsible for one of the three petitions to the VAMC administration concerning Roberts. While acknowledging that she had personally seen no detrimental patient impact attributable to Roberts, Dr. Dunn felt that the source of the events and morale problems in the operating room at the time was Roberts. Dr. Dunn drafted the petition herself, without request by or input from Hagen, because she thought it "might make a difference." Significantly, Dr. Dunn testified that she would not have continued to allow her patients to be placed under Roberts' care. In Dr. Dunn's opinion, Roberts disrupted the operating room, caused morale problems and created stress in the operating room that was counter productive to patient care. According to Dr. Dunn, morale and work flow improved when Roberts left the operating room.

Carol Dubay, a registered nurse in the operating room at VAMC, testified that the operating room was a high stress, fast paced place and that many of the veterans treated there are "sicker" than private sector patients generally. According to Dubay, Roberts created a lot of the stress in the operating room , became angry, slammed doors and threw things. Roberts' behavior in the operating room put other employees "on edge" and Dubay did not want to work with Roberts. According to Dubay, the atmosphere in the operating room improved considerably after Roberts was detailed out.

Perhaps the most damning testimony about Roberts' performance, however, came from Dr. Janet Brown, an opthamologic surgeon at VAMC. Dr. Brown, an assistant professor at the College of Medicine for ten (10) years, had performed surgery at VAMC for 19 years. Dr. Brown performed a lot of cataract surgery which was done with a topical anesthesia applied with the patient awake. This is very precise surgery, performed in a very quiet and calm environment, and the patient needs to be very still during surgery. Dr. Brown experienced problems with Roberts not giving sufficient anesthesia to patients and frequently asked Roberts for additional patient sedation because the patient was moving. Roberts did not seem to be willing to communicate with the doctor or comply with her requests. Roberts' behavior caused arguments and kept Dr. Brown from concentrating on her duties. Dr. Brown reported no problem with any other CRNA.[8]

_____

[8] Although Roberts testified that she confronted Dr. Brown about these accusations and that Dr. Brown told her that she was mistaken and had her confused with another CRNA, Dr. Brown denied any such confrontation. No motive for lying on the part of Dr. Brown was suggested to this Court and the Court fully credits Dr. Brown's testimony.

Roberts' actions increased patient risk, discomfort and stress.  Dr. Brown reported Roberts' inadequate job performance to Dr. Goulding but there was no change in Roberts' performance.   Dr. Brown's opinion was that Roberts' performance created a great deal of stress and anxiety in the operating room and "directly affected patient care."  Roberts' behavior was "distracting to everyone in the operating room."   The operating room was calmer and returned to normal when Roberts was detailed out.              Wanda Ibrahim, head CRNA at VAMC, is the most  senior CRNA in the operating room.   Along with Dr. Goulding, she interviewed Roberts for her position at VAMC and recommended that she be hired.   During her first two years at VAMC, Roberts made "lots of complaints"  but the problems with her began in earnest in February, 1999, when Ruben Fuentes was hired, according  to  Ibrahim.    Roberts  made  numerous  complaints  about  Ibrahim  and complained about her room assignments and holiday duty.[9]  Ibrahim experienced a host of conflicts with Roberts.   Roberts was absent from the department for long periods of time which led to anger and resentment by other CRNAs.

Cancellaro testified that he did not retaliate against Roberts for filing her EEO complaint.   As Chief of Staff, he never became involved in EEO complaints.   After receiving the employee petitions from Dr. Gerber,  Cancellaro believed that patient care was at risk.   As a result of his concern, he  temporarily detailed Roberts immediately to another area. After receipt of the ABI report, Cancellaro permanently reassigned Roberts

---

[9]   Roberts complained, according to Ibrahim, about everything from "a to z."

from the operating room.

## *Analysis*

The 1964 Civil Rights Act protects an employee who has "opposed any practice made an unlawful employment practice" by Title VII or who has made a charge under the statutory scheme. 42 U.S.C. § 2000e-3(a) (1988).[10]  Thus, this section prohibits an employer from retaliating against an employee who has "participated" in any manner in an investigation under Title VII. *Booker v. Brown & Williamson Tobacco Co.*, 879 F. 2d 1304, 1312 (6th Cir. 1989).

To establish a claim under § 2000e-3(a), plaintiff must meet the test of a slightly modified *McDonnell Douglas* framework by showing that:  (1) she engaged in activity protected by Title VII; (2)  this exercise of protected rights was known to defendant; (3) defendant thereafter took an adverse employment action against plaintiff, or plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Morris v. Oldham County Fiscal Court*, 201 F. 3d 784, 792 (6th Cir. 2000)  (citing *Canitia v. Yellow Freight Systems, Inc.*, 903 F. 2d 1064, 1066

---

[10]    Section 2000e-3(a) provides in relevant part as follows:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.
42 U.S.C. § 2000e-3(a) (1994).

(6th Cir. 1990)). If plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its adverse employment action against the plaintiff. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1917, 36 L. Ed. 2d 668 (1993)). Plaintiff must then demonstrate that the proferred reason was not the true reason for the employment action, i.e. that the reason was a mere pretext for the discrimination. *Id.* (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)).

Although the parties spent considerable time at trial and in their trial briefs addressing the elements of a *prima facie* case and whether or not plaintiff's proof established those elements, that decision was made by this Court in the context of the defendant's summary judgment motion, which was denied by the Court. The question of whether or not Roberts has made out a *prima facie* case, therefore, is not the focus of this Court's inquiry and, in fact, whether the plaintiff really did so is no longer relevant. A *prima facie* case is defined as sufficient evidence to allow a plaintiff to avoid a directed verdict in a jury case or a motion to dismiss in a non-jury case; "it is the evidence necessary to require the defendant to proceed with his case." *EEOC v Avery Dennison Corp.*, 104 F. 3d 858, 861 (6th Cir. 1997).

After there has been a full trial on the merits, a district court must focus on the ultimate question of discrimination rather than on whether a plaintiff has made out her *prima facie* case, regardless of whether the proceeding is a bench or jury trial. *Kovacevich*

*v. Kent State University*, 224 F. 3d 806 (6th Cir. 2000). That is, "the sole remaining issue

[is] 'discrimination *vel non*'." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

143, 120 S. Ct. 2897, 147 L. Ed. 2d 105 (2000). "Of course, there is nothing to prevent

the court from considering evidence that also bears on that *prima facie* case as long as it

does so in order to address the ultimate question of discrimination." *Kovacevich,* 224 F.

3d at 825. "The ultimate burden of persuading the trier of fact that the defendant

intentionally discriminated against the plaintiff remains at all times with the plaintiff." *St.*

*Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 518, 113 S. Ct. 2742, 125 L. Ed. 2d 407

(1993)(quoting *Burdine*, 450 U.S. at 253, 101 S. Ct. 1089).

Against this backdrop, this Court is thus faced with a very simple issue:

Was plaintiff's permanent reassignment to the gastrointestinal lab on August 1, 2002 an

adverse employment action taken in retaliation for the filing by her of an EEO complaint

in April, 2001?[11] Said differently, this Court must decide whether or not the defendant

has discriminated against plaintiff as a result of her having participated in protected

activity. Participation clause claims, such as the plaintiff's here, must be liberally

construed. As the Sixth Circuit has stated in its *Booker* decision:

> The "exceptionally broad protections" of the participation
> clause extends to persons who have "participated in any
> manner" in Title VII proceedings. *Pettway v. American Cast*

---

[11] Plaintiff claims a whole host of actions on the part of the VAMC as retaliatory, including the withholding of documents under the FOIA. None of these actions on the part of the VAMC constitute adverse employment actions, and, even if they did, this Court's analysis would not change.

14

> *Iron Pipe Co.*, 411 F. 2d 998, 1006 (5th Cir. 1969). Protection
> is not lost if the employee is wrong on the merit of the charge,
> *Womack v. Munson*, 619 F. 2d 1292, 1298 (8th Cir. 1980), *cert.
> denied*, 450 U.S. 979, 101 S. Ct. 1513, 67 L. Ed. 2d 814 (1981),
> nor is protection lost if the contents of the charge are malicious
> or defamatory as well as wrong. *Pettway*, 411 F. 2d at 1007.
> Thus, once activity in question is found to be within the scope
> of the participation clause, the employee is generally protected
> from retaliation.

*Booker*, 879 F. 2d at 1312.

Plaintiff's Title VII claim in this case fails for a very simple reason. Plaintiff has failed to establish a causal connection between the protected activity and the adverse employment action taken by the defendant. Defendant has put forth a compelling, non-discriminatory reason for the transfer of the plaintiff from the operating room. The proof in this case establishes quite compellingly that plaintiff created disruption and disharmony in the operating room, that she sought to curry favoritism with persons with authority to determine her conditions of employment, that she was often demanding, that she had great difficulty getting along with others on her work team and did not fully cooperate with the group and, more importantly, that she refused direct physician directives in dealing with patient sedation, all of which had a clear potential for significant, detrimental impact on patient care at VAMC. The defendant having articulated a legitimate, non-discriminatory reason for its adverse employment action against the plaintiff, plaintiff then has the burden to demonstrate that the proffered reason was merely a pretext for discrimination. Plaintiff has failed in this burden.

In support of plaintiff's effort to establish a causal link between the filing of her EEO complaints and her reassignment from the operating room,  plaintiff relies heavily on the actions of her co-workers in distributing various petitions throughout the operating room after these employees had learned of the  EEO complaints filed by Roberts against nursing supervisor Hagen.   Even if these employees were motivated by the filing of Roberts' EEO complaint, that is largely irrelevant here.    None of the employees involved in the petitions were the decision makers in this case and actions and/or statements by subordinates normally are not probative of an intent to retaliate by the actual decision maker.  *Willis v. Marion County Auditors Office*, 118 F. 3d 542 (6th Cir. 1997).

A causal link may also be shown through knowledge combined with closeness in time that creates an inference of causation.[12]    In order to make such a showing, however, the plaintiff must produce sufficient evidence for the Court to infer that the employer would not have taken the adverse action had the plaintiff not filed a discrimination action.  *See Avery Dennison Corp.*, 104 F. 3d at 861.   In order to meet the burden of proof on  causal connection, the plaintiff must "put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity [which requires] the court to draw reasonable inferences from that evidence, providing it

---

[12]    While the parties in this case have vigorously litigated the question of knowledge on the part of the decision maker, Cancellaro, this Court has little difficulty finding that Cancellaro had knowledge of the protected conduct.  First of all, Cancellaro was aware from Roberts that an EEO complaint had been filed but, more clearly, both the reports of the Fact Finding  Board and the ABI reference pending EEO complaints.   It is not disputed that Dr. Gerber also knew of the EEO complaints.

16

is credible." *Id.* Plaintiff also argues that the temporal proximity between the filing of her complaints and the adverse employment action supports an inference of retaliatory discrimination. Temporal proximity alone does not support an inference of retaliatory discrimination in the absence of other evidence; however, closeness in time between the filing of the EEO complaint and the adverse employment action is relevant and may evidence the employer's intent. *Cooper v. City of North Olmsted*, 795 F. 2d 1265, 1272-73 (6th Cir. 1986)

The burden is on the plaintiff in this case to prove by a preponderance of the evidence that the non-discriminatory reason put forth by the defendant is pretext for discrimination. *See Avery Dennison Corp.*, 104 F. 3d at 862. In meeting this burden, the plaintiff may succeed either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *St. Mary's Honor Ctr.*, 509 U.S. at 502. With respect to the indirect method of proof, which is what is involved in this case, "[i]t is not enough . . . to (dis)believe the employer; the fact finder must believe the plaintiff's explanation of intentional discrimination. *Id.* at 519. The Supreme Court has explained that "Title VII does not award damages against employers who cannot prove a non-discriminatory reason for adverse employment action, but only against employers who are proven to have taken adverse employment action by reason of . . ." plaintiff having filed, in the context of this case, EEO complaints. *Id.* at 523-524. Even were this Court not

to believe that the reason put forth by the VAMC for the employment action taken against Roberts or that VAMC contrived such evidence (which is not the case), that would not necessarily establish, therefore, that the plaintiff's claim of discrimination is correct. Instead, this Court must believe the reason offered by the plaintiff, that is, it must believe that the plaintiff was the victim of intentional discrimination. This Court simply cannot find that the plaintiff has carried the burden of proving to this Court by a preponderance of the evidence that she has been the victim of intentional discrimination.

Defendant has met its burden of production in this case and has offered a legitimate, non-discriminatory reason for the action taken against Roberts. Any presumption of discrimination "drops out of the picture" once the defendant meets its burden of production. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). Even though this Court has previously determined, in the context of its summary judgment rulings, that plaintiff has produced sufficient evidence to support a *prima facie* case, the evidence at trial on the elements of the *prima facie* case were close and any inferences of discrimination arising therefrom were weak.

 The adverse employment action taken by the defendant in this case was slight, considerable question exists about the extent of Dr. Cancellaro's knowledge of the plaintiff's participation in protected activity and there is simply no evidence which has been put forth which suggests, either directly or indirectly, that Cancellaro acted with a discriminatory motive or for any reason other than to protect the quality of patient care at

VAMC.

Even though plaintiff has established a *prima facie* case, the defendant has met its burden of production by offering a legitimate, non-discriminatory reason for the adverse employment action taken and Roberts has failed completely to prove, by a preponderance of the evidence, that the proffered reason of the defendant is pretextual, nor has she shown any other direct or indirect evidence of illegal discrimination in violation of Title VII in the actions taken in transferring her from the operating room at VAMC. No employer in the healthcare field should be required to ignore complaints of actions on the part of an employee which compromise patient welfare simply because the employee has participated in protected activity. The activity engaged in by Roberts, even though it may have been frivolous, was protected activity under the law and she may not be retaliated against for participating in such protected activity; however, Roberts has utterly failed to present evidence sufficient to establish by a preponderance of the evidence that defendant acted against her with a discriminatory motive or for any reason other than to assure the quality of medical care delivered to veterans who seek services through the operating room at VAMC.

An employer does not lose the ability to discipline an employee who engages in employee misconduct merely because she has filed an EEO complaint. *Booker*, 879 F. 2d at 1312. An employee is not protected when she disrupts the work environment and interferes with the attainment of the employer's goals. *Brown v. Ralston Purina Co.*, 557

F. 2d 570, 572 (6th Cir. 1977).  If that were the case, an unprofessional, disruptive and unruly employee could insulate  her misconduct from disciplinary action simply by the filing of a frivolous EEO complaint.  Title VII was never intended to produce such a result.

For these reasons, plaintiff's Title VII complaint will be **DISMISSED**.

## *Plaintiff's  FOIA  Claim  for Attorney's  Fees*

Beginning in mid-2001, Roberts began requesting copies of the employee petitions, letters and/or memos which initiated the series of events which led to her temporary detail out of the operating room.  These requests were directed to Gerber and copies were sent to various other VAMC officials.  On October 31, 2001, Roberts renewed her request by specific reference to the FOIA and continued to request production of these documents through July, 2002.  On February 21, 2002, the VAMC denied the request on the basis that the requested documents were "protected from disclosure under exemptions 5 and 6 of the FOIA . . ."[13]  Roberts' appealed the agency decision to the VA general counsel on March 25, 2002.  It is undisputed by the parties that the VA maintained its decision that the documents were not subject to disclosure through the time of the filing

---

[13]   5 U.S.C. § 552(b)(5) and (6) exempt from production under the FOIA certain intra-agency or inter-agency memoranda or letters and personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.  The VA has taken inconsistent positions with respect to whether or not it appropriately withheld the requested documents, arguing in one pleading it withheld the documents completely and appropriately pursuant to these exceptions but acknowledging in another pleading that the documents were provided after the designated official at VAMC realized she had misinterpreted the applicable rules.  That really is of no consequence to this Court's decision on this issue.

of Roberts' complaint herein on June 25, 2002. The disputed documents were provided

to Roberts on or about August 19, 2002. The documents were provided after the

designated official at the VAMC realized that she has misinterpreted the regulations. The

error was apparently unintentional and was corrected by the production of the requested

documents as soon as the error was realized.

"The Congressional policy behind the F.O.I.A. is to encourage public access

to government information and to enable individual citizens to pursue their statutory rights

by eliminating administrative barriers that could only be hurdled through expensive

litigation." *Seegull Mfg. Co. v. N.L.R.B.,* 741 F. 2d 882, 886 N. 1 (6th Cir. 1984) (citations

omitted). 5 U.S.C. § 552(a)(4)(E) provides:

> The Court may assess against the United States reasonable
> attorney fees and other litigation costs reasonably incurred in
> any case under this section in which the complainant has
> substantially prevailed.

In determining whether to grant attorney fees under the FOIA, courts apply

a two part test. *GMRI, Inc. v. E.E.O.C.*, 149 F. 3d 449, 451 (6th Cir. 1998). First, the

court must "decide whether the plaintiff 'substantially prevailed' and is thus eligible for

such an award. If so, [then the court must] determine whether the plaintiff is entitled to

such an award based upon a balancing of equitable considerations." *Id.* Prior to 2001, a

plaintiff need not have won a lawsuit or received a court order compelling the

government to produce the requested documents. Instead, a plaintiff "will have

substantially prevailed if it demonstrates that the prosecution of the lawsuit was reasonably necessary to obtain requested information, and that the existence of the lawsuit had a causative effect upon the release of that information." *Id.* at 451-452. In *GRMI*, decided prior to *Buckhannon Board and Care Home, Inc.v. West Virginia Department of Health and Human Resources,* 532 U.S. 598, 121 S. Ct. 1835, 149 L. Ed. 2d 855 (2001)(discussed below), the Court of Appeals for the Sixth Circuit found it irrelevant that a plaintiff "did not obtain a court order compelling the agency to produce the requested documents" since the lawsuit was a "catalyst" to the release of the documents. *Id.* at 451-52.

The defendant contends that the plaintiff did not "substantially prevail" in her lawsuit and that Roberts has presented no evidence on the issue. Ordinarily, the better practice would be for this Court to hold an evidentiary hearing on this issue; *See Sargeant v. Sharp*, 579 F. 2d 645, 647 (1st Cir. 1978); however, the Court has sufficient information before it for a determination of this issue without an evidentiary hearing. The relevant facts are not in dispute. Under existing precedent prior to 2001, the plaintiff would likely have prevailed on her claim for attorney fees and this Court would have found that plaintiff had "substantially prevailed" because her lawsuit had at least some causative effect upon the release of the requested information. Under the current state of the law, however, such a conclusion is not at all as clear.

In *Buckhannon*, the Supreme Court rejected the "catalyst theory" and held that to "prevail" under the Fair Housing Act and Americans With Disabilities Act, a plaintiff must obtain a "judicially sanctioned change in the legal relationship of the parties." *Buckhannon* at 605. The court stated that a "defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit lacks the necessary judicial imprimatur on the change." *Id.* "A plaintiff must receive at least some relief on the merits of his claim before he can be said to prevail." *Id.*

The Sixth Circuit has not yet specifically addressed whether the *Buckhannon* standard replaces the *GMRI* standard for analysis of fee awards in FOIA cases. The plaintiff argues that the Supreme Court's disapproval of the catalyst theory of attorney fees recovery is limited to awards under "prevailing party" attorneys' fees statutes such as 42 U.S.C. § 1988, where either the plaintiff or the defendant is allowed to recover attorneys' fees after a judicial decision in either's favor. Although *Buckhannon* was not a FOIA case, the Supreme Court did note that the federal fee shifting statutes should be interpreted consistently and referred to a list of such statutes, which included FOIA. *Buckhannon*, 532 U.S. at 598, 602-603, n 4 (citing to appendix to opinion of *Brennen*, J. dissenting in *Marek v. Chesney*, 473 U.S. 1, 43-51, 105 S. Ct. 3012, 87 L. Ed. 2d 1 (1985)). Since *Buckhannon*, two other circuits have applied its standard to FOIA cases. *See Edmonds v. Federal Bureau of Investigation*, 417 F. 3d 1319 (D.C. Cir. 2005); *Union*

*of Needletrades, Industrial and Textile Employees, AFL-CIO v. United States Immigration and Naturalization Service*, 336 F. 3d 200 (2ⁿᵈ Cir. 2003); *Oil, Chemical and Atomic Workers International Union v. Department of Energy*, 288 F. 3d 452 (D.C. Cir. 2002). The Sixth Circuit has applied *Buchannon* to attorney fee awards in cases under 42 U.S.C. §§ 1983 and 1988; *See Dubuc v. Green Oak Township*, 312 F. 3d 736 (6th Cir. 2002), *Chambers v. Ohio Department of Human Services*, 273 F. 3d 690 (6th Cir. 2001); *Hargis v. City of Cookeville, TN*, 92 Fed. Appx. 190 (6th Cir. 2004) (Not Recommended for Full Text Publication); and *Toms v. Taft*, 338 F. 3d 519 (6th Cir. 2003). At least one district court in the Sixth Circuit has held that the *Buckhannon* applies to awarding attorney's fees under FOIA. *See AutoAlliance International, Inc. v. United States Customs Service*, 300 F. Supp. 2d 509 (E.D. Mich. 2004).

Although it is true that *Buckhannon* involved the award of attorney's fees under a different statute than is at issue here, the United States Supreme Court expressly stated that all statutes that authorize attorney's fees to the "prevailing party" are to be treated consistently. Under the *Buckhannon* standard, a party prevails, and thus becomes eligible for attorney's fees, only where the party has obtained ***"a judicially sanctioned change in the legal relationship of the parties."*** *Id.* at 1840. (emphasis added). An award of attorney's fees is appropriate only where a plaintiff has obtained an "enforceable judgment" on the merits or a "court-ordered consent decree" but not under the catalyst theory, ***"which allows an award where there is no judicially sanctioned change in the***

*legal relationship of the parties." Id.* (emphasis added). Thus, this Court must conclude, as did the Supreme Court in *Buckhannon*, that the VA's "voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial imprimatur on the change." Based on this analysis, this Court rejects the catalyst theory as a permissible basis for awarding attorney's fees under FOIA and holds that a "judicially sanctioned change in the legal relationship of the parties" is required before plaintiff can prevail on a claim for attorney's fees under FOIA. Applying this analysis to the instant case, plaintiff has not "substantially prevailed" in her FOIA claim against the defendant and her request for attorney's fees must be **DENIED**.

A separate judgment in favor of the defendant shall enter.

ENTER:

<u>s/J. RONNIE GREER</u>
UNITED STATES DISTRICT JUDGE